UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JOHN M. FOLEY,<br><br>    Plaintiff,<br><br>    v.<br><br>MAINESTAY MEDIA, LLC<br><br>    Defendant. | Civil Action No. |

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, John M. ("Jack") Foley ("Mr. Foley" or "Plaintiff"), by and through undersigned counsel, and complains against the Defendants, MaineStay Media, LLC ("MaineStay Media") as follows:

JURISDICTION AND PARTIES

1. This action arises under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.*

2. Mr. Foley is a United States citizen residing in Aberdeen, North Carolina.

3. MaineStay Media is a limited liability, for profit corporation doing business in Maine. Its principal home office is in Rockland, Maine.

4. MaineStay Media had 15 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

5. The amount in controversy exceeds $75,000.

6. This Court has subject matter jurisdiction over Mr. Foley's federal and state claims pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

1

7. On June 25, 2023, Mr. Foley filed a timely Complaint/Charge of Discrimination against Defendant alleging unlawful disability discrimination and retaliation with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

8. On or about July 23, 2024, the MHRC issued a Notice of Right to Sue with respect to Mr. Foley's state law claims.

9. On or about August 21, 2024, the EEOC issued a Notice of Right to Sue with respect to Mr. Foley's federal law claims.

10. Mr. Foley has exhausted his administrative remedies with respect to all claims set forth in this Complaint.

## JURY TRIAL REQUESTED

11. Mr. Foley requests a trial by jury for all claims and issues for which a jury is permitted.

## FACTUAL ALLEGATIONS

12. At all times material to this case, MaineStay Media has operated a number of weekly newspapers including the Camden Herald, the Courier Gazette, the Ellsworth American, the Free Press, the Mount Desert Islander, the Republican Journal, and the Village Soup.

13. Mr. Foley was born in 1947.

14. Mr. Foley's extensive career in journalism spans over 45 years, covering various aspects such as general reporting, investigative journalism, editorial and obituary writing, and magazine contributions.

15. He has held roles as an editor and completed two overseas assignments.

16. His experience includes coverage of natural disasters like wildfires, earthquakes in California and Mexico, and coverage of a war in Asia, as well as teaching journalism at the college level.

17. In July of 2022, Mr. Foley applied for a Staff Reporter position with Defendant after relocating to Rockland, Maine, seeking employment in print journalism.

18. He believed he was well-suited for the role given his extensive background, including a tenure as a Public Affairs Officer at NASA and recognition as a co-winner of a staff Pulitzer Prize in Journalism.

19. Upon his hiring, Mr. Foley worked closely with Zack Miller, who served as the Managing Editor for The Camden Herald at that time. His interviews were conducted by Mr. Miller, Christine Simmonds (Managing Editor of the Courier-Gazette), and Christopher Crockett (Publisher at MaineStay Media/Courier Publications).

20. Unbeknownst to Mr. Foley, Mr. Miller and Ms. Simmonds had been promoted to their respective Managing Editor positions to fill vacancies left by the departure of Daniel Dunkle, the former Executive Editor overseeing two newspapers.

21. Mr. Foley commenced his employment on August 15, 2022, contributing to the Camden Herald and the Courier-Gazette, and possibly other MaineStay publications.

22. His responsibilities included news and feature writing, as well as photojournalism centered around Camden and Rockport.

23. He also actively participated in weekly news meetings, primarily conducted via Zoom, and played a role in shaping editorial discussions.

24. Additionally, Mr. Foley contributed to the development of a weekly editorial cartoon, even originating an idea for one entirely on his own.

25. His working relationship with Mr. Miller was characterized by mutual respect, despite their significant differences in age and experience within the industry.

26. They never experienced disagreements, nor did Mr. Miller insult or belittle Mr. Foley in any context, whether in person, in writing, or in front of readers. Mr. Miller consistently upheld Mr. Foley's credibility as a journalist.

27. Shortly after Mr. Foley's hiring, Mr. Dunkle returned to Defendant as the Executive Editor, filling the role vacated when he had left for a public relations position at Pen Bay Medical Center.

28. Subsequently, Mr. Miller transitioned to the public relations role that Mr. Dunkle had vacated at Pen Bay Medical Center.

29. Mr. Dunkle's behavior towards Mr. Foley was notably different from Mr. Miller's behavior.

30. Mr. Dunkle had no role or input in the decision to hire Mr. Foley.

31. From the outset, he exhibited disrespect, insult, and condescension toward Mr. Foley, particularly on the basis of his age.

32. This manifested in dismissive treatment of Mr. Foley's skills and knowledge, along with mockery and dismissal of his comments and observations.

33. Mr. Dunkle expressed a lack of trust, often ridiculed Mr. Foley, and subjected him to rigorous and demeaning edits.

34. Mr. Dunkle also questioned the accuracy of Mr. Foley's reporting, only to later acknowledge Mr. Foley's correctness.

35. Mr. Dunkle made derogatory age-related remarks, expressing a preference for working with much younger journalists and suggesting that individuals of Mr. Foley's age were

ill-suited for certain tasks. He also conveyed a preference for recent graduates or early-career reporters, asserting that he could shape them more easily before they acquired the so-called "bad habits" of seasoned journalists.

36. Mr. Foley's performance on the job was consistently satisfactory or better, as evidenced by a reader's complement of his reporting, expressing delight in reading anything authored by Jack Foley.

37. Mr. Betts, a much younger staff reporter for the Courier-Gazette, was treated differently.

38. He was allowed to miss the weekly news meetings that Mr. Foley attended.

39. Additionally, Mr. Dunkle refrained from criticizing or editing Mr. Betts' work, and Mr. Betts was entrusted to submit his articles directly to the live website without Mr. Dunkle's edits.

40. Conversely, Mr. Dunkle treated Mr. Foley with disrespect, displayed significant criticism of his work, and frequently erred in his editing of Mr. Foley's work.

41. Despite negative feedback about Mr. Betts' reporting from readers, he received preferential treatment compared to Mr. Foley.

42. On January 27, 2023, Mr. Foley learned that Mr. Dunkle unilaterally altered an article Mr. Foley had written, which had been previously approved and published after undergoing days of challenging and offensive criticism from Mr. Dunkle.

43. This revision was made in response to an objection from the subject of the article, Pen Bay Medical Center.

44. Mr. Foley considers this action a breach of established industry norms, as it is customary to discuss significant editing changes with the reporter before implementation.

5

45. Mr. Dunkle's actions significantly undermined Mr. Foley's credibility within the community and among his colleagues, causing Mr. Foley great distress and physical discomfort, culminating in chest pain.

46. On the same day, Mr. Foley contacted the publisher, Chris Crockett, seeking a meeting to address Mr. Dunkle's conduct.

47. Mr. Crockett did not respond to the email.

48. Instead, Mr. Dunkle contacted Mr. Foley, requesting a meeting with both him and HR Director Tricia Johnson on January 31, 2023.

49. Throughout the day and night, Mr. Foley continued to experience chest pain, which escalated to discomfort in his shoulder and neck.

50. Despite administering nitroglycerin, the pain persisted.

51. Upon the insistence of his partner, Mr. Foley was transported to Pen Bay Medical Center in Rockport.

52. Subsequently, Mr. Foley received a diagnosis of a heart attack and the presence of two blockages in the left anterior descending artery. He believes that Mr. Dunkle's discriminatory behavior and relentless negativity towards him and his work contributed to the onset of the heart attack.

53. On January 28, 2023, Mr. Foley notified Mr. Dunkle of his hospitalization due to a coronary-related episode, expressing uncertainty about his ability to meet on the scheduled Tuesday.

54. A day or two later, Mr. Foley was transferred to Portland for medical care, where a stent was inserted.

55. Shortly after, he experienced a life-threatening stent thrombosis, necessitating a return to the operating room for the placement of another stent.

56. Throughout this period, Mr. Foley kept Defendant informed of his medical condition.

57. On February 15, 2023, his cardiologist provided written clearance for his return to work after completing four weeks of cardiac rehab, which Mr. Foley promptly shared with Defendant.

58. On February 27, 2023, Mr. Foley informed both Mr. Dunkle and Ms. Johnson via email that cardiac rehab had to be briefly postponed due to a second hospitalization.

59. Until the receipt of the termination notice around March 9 or 10, 2023, all communications from the company expressed well-wishes for Mr. Foley's recovery and assured him that they could manage the workload without him.

60. At no point was there any indication that his employment would be terminated if he did not return to work promptly or by a specific date.

61. Around March 9 or 10, 2023, Mr. Foley received a termination notice by certified mail, retroactively effective March 8, 2023.

62. The letter suggested that he could reapply for employment within the Defendant's Media Family once he had recovered.

63. On April 3, 2023, Mr. Foley emailed Ms. Johnson, notifying the company that he anticipated being cleared for work by his doctor around April 10, 2023.

64. He sought guidance on the best approach to returning to work but received no response.

65. Following the receipt of the termination notice, Mr. Foley regularly checked the newspaper and online platforms to see if Defendant was advertising to fill his position. The only related ad was for a position at one of the Camden Herald's sister papers, the Ellsworth American, located about an hour away from Mr. Foley's residence.

66. During the period from February 2, 2023 to February 23, 2023, Defendant posted a help wanted advertisement in its Maine newspapers' classified section for a Staff Reporter.

67. The advertisement indicated that applicants should reach out to Mr. Dunkle and Christine Simmonds.

68. Mr. Dunkle and Ms. Simmonds were decision makers with regard to the hiring for the open staff reporter position.

69. The advertisement listed the Courier-Gazette, the Camden Herald, the Republican Journal, the Free Press, and the Village Soup.

70. Defendant was having difficulty finding employees, including reporters, during this timeframe and so pretty much had a continuous advertisement looking for employees at this time.

71. Mr. Dunkle played a substantive role in the efforts to find new employees, including reporters.

72. The open position was not Mr. Foley's position but rather was an additional position that would cover Knox and Waldo counties for the Camden Herald and the Republican Journal.

73. Defendant was short staffed at both the Camden Herald and the Republican Journal and this prompted the advertisement.

74. On February 24, 2023, Defendant received an email from AB[1] expressing interest in the position.

75. AB was interviewed on March 16, 2023 and was hired and started the position around March 29, 2023.

76. AB was substantially younger than Mr. Foley.

77. AB's initial pay was greater than what was offered and paid to Mr. Foley.

78. On or about June 22, 2023, Defendant hired another staff reporter, BC[2].

79. BC was in his thirties at the time of his hire.

80. Despite knowing that Mr. Foley was cleared to return to work, Defendant did not reach out to Mr. Foley or notify him of the opening.

81. The fact that Defendant hired a reporter for an additional position in February 2023 and another reporter in June 2023 demonstrates that Defendant had an ongoing need for reporters during the timeframe that Mr. Foley was terminated and was cleared to return to work.

82. As of April 27, 2023, Mr. Foley's name still appeared as a Reporter on the Knox Village Soup website, despite his termination.

83. Mr. Foley has a disability under the ADA and MHRA. His heart attack and the presence of two blockages in the left anterior descending artery and related stent thrombosis constitute a "heart condition" for purposes of the MHRA and so are included on the MHRA's per se list of disabilities.

84. Mr. Foley has continued to receive treatment for his heart condition to the present and takes five medications for his condition. As of August 2024, Mr. Foley's condition has been labelled "heart failure" by his physician.

---

[1] This applicant/employee's name has been replaced with a pseudonym to protect privacy.
[2] This applicant/employee's name has been replaced with a pseudonym to protect privacy.

85. Mr. Foley's heart condition also substantially limited the functioning of Mr. Foley's cardiac and circulatory systems, particularly when viewed in the absence of mitigating measures and substantially limited other major life activities.

86. Mr. Foley's heart condition significantly impaired and continues to impair his physical health.

87. Mr. Foley also informed his employer that he was a cancer patient.  Cancer is included in the MHRA's list of per se disabilities and Mr. Foley's cancer substantially limited major life activities and impaired his physical health when viewed in the absence of mitigating measures.

88. Defendant's managers regarded Mr. Foley as a person with a physical impairment and a disability and considered him a less valuable and less capable employee because of his impairment.

89. Mr. Foley's communications to Defendant following his heart attack; including his notification of Mr. Dunkle on January 28, 2023 of his heart attack and hospitalization, his February 15, 2023 communication regarding his prognosis of being able to return following four weeks of cardiac rehabilitation, and his February 27, 2023 communication regarding the need to briefly postpone the cardiac rehabilitation due to a second hospitalization; constituted requests for reasonable accommodation that notified Defendant that he had a protected disability, required the accommodation of unpaid medical leave for a period of a few weeks while he recovered, and would return to his position after his period of recovery.

90. Courts have consistently held that unpaid medical leave may be a reasonable accommodation under the ADA.

91. In 2019, the Maine Legislature amended the MHRA to expressly provide that reasonable accommodations include "leaves of absence". 5 M.R.S. Sec. 4553(9-A)(B).

There is no doubt that medical leaves may be a reasonable accommodation under the ADA and MHRA.

92. Mr. Foley could have returned to work as of April 10, 2023 and notified the Defendant as much on April 3, 2023.

93. Mr. Foley's request that his position be protected through unpaid leave through his recovery was a request for a reasonable accommodation.

94. It would have been reasonable for the Defendant to protect Mr. Foley's position for the ten weeks that he recovered from his heart attack and related issues.

95. The fact that Defendant hired a new reporter for an additional position and that reporter started work around the same time that Mr. Foley was able to return to work and hired another reporter in June 2023 is strong evidence that Defendant had an ongoing need for someone to fill Mr. Foley's position and that it would have been reasonable to provide Mr. Foley with leave and permit him to return to work as of April 10, 2023.

96. In the letter notifying Mr. Foley of his termination, Defendant wrote as follows: "This letter is to inform you that your employment with MaineStay media has been terminated. With the launch of the new Camden Herald, we can no longer hold your position and will need to find coverage in order for us to move forward with the workflow".

97. This stated reason was false. As set out above, Defendant hired AB in response to an advertisement for an additional reporter position. Providing Mr. Foley was medical leave until he could return in a few weeks would not have impacted Defendant's ability to "find coverage" where Defendant had a need for Mr. Foley's position and an additional position for AB. In addition, the next reporter, BC, was hired by Defendant in June 2023, months after Mr. Foley notified Defendant that he could return to work on April 10, 2023.

98. Firing Mr. Foley did not provide Defendant with more "coverage". Retaining Mr. Foley would have provided Defendant with more coverage.

99. When Defendant produced a copy of Mr. Foley's personnel file in response to a request from Plaintiff's counsel, it contained some additional rationale for Mr. Foley's termination, stating:

> "MSM could no longer hold Jack's position as a reporter with The Camden Herald…Jack's actual last day worked was 11/27/2022. With the reasoning stated above, that the MSM is going through major restructuring not only with of (sic) the Camden Herald but with the Courier Gazette, the Republican Journal and online platform. With limited staff currently, MSM needed to find coverage to move forward."

100. This claim by Defendant is clearly false. Mr. Foley's last day worked was at the end of January 2023, not in November 2022 as alleged.

101. This rationale is also demonstrably false where it suggests that Mr. Foley needed to be fired in order to increase the reporter coverage for Defendant's family of newspapers. AB was hired to fill a separate position for which there was a need and BC was not hired until months after Mr. Foley was able to return to work. The termination of Mr. Foley accomplished nothing in terms of increasing Defendant's reporter coverage and in fact accomplished the opposite.

102. Defendant failed to make reasonable accommodations to the known disability of Plaintiff, an otherwise qualified individual with a disability who was an employee, in violation of the MHRA and ADA.

103. A failure to accommodate claim does not require a showing of unlawful intent or animus, rather, if a Defendant denies a qualified employee with a disability a reasonable accommodation then they are liable under state and federal law.

104. In any case, there is substantial evidence of unlawful motive in connection with Mr. Foley's disability including probative timing, pretext, and comparator evidence.

105. Defendant terminated Plaintiff because he requested and required medical leave due to his disability in violation of the MHRA and ADA.

106. Defendant unlawfully terminated Plaintiff because of his disability, because of his request and need for accommodation, and because of a reason that could have been addressed through reasonable accommodation, namely an unpaid medical leave in violation of the MHRA and ADA.

107. On June 15, 2023, Mr. Foley's attorney sent a letter via certified mail, return receipt requested to Defendant.  The letter included a copy of Mr. Foley's Charge of Discrimination that was being filed with the MHRC and EEOC and reflected that Mr. Foley was represented by counsel in the matter.

108. Defendant received and signed for the letter referenced above on June 20, 2023.

109. Defendant hired a less qualified stranger, BC, rather than reinstate Mr. Foley on June 22, 2023.

110. Defendant hired BC rather than reinstate Mr. Foley, in part, because Mr. Foley filed Charges of Discrimination against Defendant.

111. Defendant's hire of BC rather than Mr. Foley because of his filing of Charges of Discrimination violates the anti-retaliation provisions of the MHRA, ADA, and ADEA.

112. Defendant hired AB and BC and terminated Mr. Foley because of age.

113. Evidence of ageist animus, pretext, and comparator evidence reflect unlawful age discrimination.

114. Plaintiff suffered substantial economic losses as a result of Defendant's discrimination and retaliation. And continues to do so.

115. Defendant's discrimination and retaliation has caused Plaintiff substantial stress, anxiety, and humiliation and other non-economic damages.

116. Defendant knowingly violated Plaintiff's state and federal rights and/or violated Plaintiff's rights with reckless indifference and so is liable for punitive damages.

### COUNT I: ADA - DISABILITY DISCRIMINATION

117. Paragraphs 1-116 are incorporated by reference.

118. Defendant's conduct violates the ADA's prohibition against disability discrimination.

119. Defendant's conduct violates the ADA's requirement that employers provide reasonable accommodations to qualified employees with disabilities.

### COUNT II: ADA - RETALIATION

120. Paragraphs 1-119 are incorporated by reference.

121. Defendant engaged in unlawful retaliation against Plaintiff in violation of the ADA.

### COUNT III: MHRA - DISABILITY DISCRIMINATION

122. Paragraphs 1-121 are incorporated by reference.

123. Defendant's conduct violates the MHRA's prohibition against disability discrimination.

### COUNT IV: MHRA – AGE DISCRIMINATION

124. Paragraphs 1-123 are incorporated by reference.

125. Defendant's conduct violates the MHRA's prohibition against age discrimination.

### COUNT V: MHRA - RETALIATION

126. Paragraphs 1-125 are incorporated by reference.

127. Defendant engaged in unlawful retaliation against Plaintiff in violation of the MHRA.

### COUNT VI: ADEA - AGE DISCRIMINATION

128. Paragraphs 1-127 are incorporated by reference.

129. Defendant's conduct violates the MHRA's prohibition against age discrimination.

### COUNT VII: ADEA - AGE DISCRIMINATION

130. Paragraphs 1-129 are incorporated by reference.

131. Defendant engaged in unlawful retaliation against Plaintiff in violation of the ADEA.

### PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A. Declare the conduct engaged in by Defendant to be in violation of his rights;

B. Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

C. Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D. Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

E. Award equitable-relief for back pay, benefits and prejudgment interest;

F.   Award compensatory damages in an amount to be determined at trial;

G.   Award punitive damages in an amount to be determined at trial;

H.   Award nominal damages;

I.   Award attorneys' fees, including legal expenses, and costs;

J.   Award prejudgment interest;

K.   Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability or retaliation;

L.   Require Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination or retaliation in the future;

M.   Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

N.   Require that Defendant train all management level employees on the protections afforded by the ADA, MHRA, and ADEA;

O.   Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated him because of disability and retaliation; and

P.   Grant to Plaintiff such other and further relief as may be just and proper.

Dated: September 3, 2024                                   /s/ Chad T. Hansen
                                                          Chad T. Hansen
                                                          Attorney for the Plaintiff

                                                          EMPLOYEE RIGHTS GROUP
                                                          92 Exchange Street 2nd floor
                                                          Portland, Maine 04101
                                                          Tel. (207) 874-0905
                                                          Chad@EmployeeRightsLaw.Attorney